**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **HUMBLE SURGICAL HOSPITAL, LLC,** | : | |
| | : | **CASE NO. 3:13-cv-01903-VLB** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **AETNA LIFE INSURANCE COMPANY** | : | |
| **Defendant.** | : | **September 30, 2014** |

**MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION TO
DISMISS, GRANTING DEFENDANT'S MOTION TO TRANSFER, AND
DENYING PLAINTIFF'S MOTION TO REMAND**

## INTRODUCTION

The plaintiff, Humble Surgical Hospital LLC ("HSH"), a Texas corporation, brings this defamation and business disparagement case against Aetna Life Insurance Company ("Aetna"), a Connecticut corporation.  Aetna has filed a motion to dismiss or, in the alternative, to transfer the case to the Southern District of Texas.  [Dkt. No. 15].  HSH in turn has filed a motion to remand the case to state court.  [Dkt. No. 22] For the reasons to follow, the court denies HSH's motion to remand, grants Aetna's motion to transfer, and denies Aetna's motion to dismiss.

## I. FACTS AND BACKGROUND

Aetna is an insurance company organized under the laws of the State of Connecticut that provides health insurance and other employee benefit services in Texas and elsewhere.  [Dkt. No. 1-2, at 1].  HSH operates a surgical hospital in Houston, Texas and is not a member of Aetna's

healthcare provider network. [*Id.*] HSH opened In August of 2010 and informed Aetna of its intent to provide out-of-network facilities and services to Aetna's insureds. [*Id.*]

In 2012 Aetna initiated a still-pending lawsuit against HSH in the Southern District of Texas, *Aetna Life Insurance v. Humble Surgical Center*, 4:12-cv-01206 (the "Texas suit"). [*Id.* at 2-3].[1]  In the Texas suit, Aetna alleges that HSH perpetrated a scheme in which HSH would entice Aetna Insureds to utilize HSH for medical procedures for which HSH would over-charge Aetna. Complaint at 2-5, *Aetna Life Insurance v. Humble Surgical Center*, 4:12-cv-01206 (S.D. Tex. Apr. 18, 2012), ECF No. 1.  Aetna alleges that HSH's actions violate the medical ethics rules of the American Medical Association and the Texas Medical Association, violate the written representations made by HSH in its bills submitted to Aetna, and are illegal under Texas state law. *Id.* at 8, 10-12, 13-15.

After filing suit and reviewing the discovery produced in the Texas case Aetna informed its insureds and certain of its network physicians that it would no longer pay claims for healthcare services rendered by HSH because it believed that HSH had filed claims with false and misleading information and had entered into improper agreements with certain of

---

[1] The Court may take notice of the pending litigation in Texas, as the parties are clearly on notice of the existence of this litigation and the filings and rulings in that case. *Cf. Gertskis v. United States EEOC*, No. 11 Civ. 5830, 2013 U.S. Dist. LEXIS 39110, at *5-6 (S.D.N.Y. Mar. 20, 2013) ("A district court reviewing a motion to dismiss may also consider documents of which it may take judicial notice, including pleadings and prior decisions in related lawsuits.").

Aetna's network physicians to compensate the physicians for referring patients to HSH.  [Dkt. 1-2, Exs. A-B.]  Aetna also sent termination letters to in-network providers who it believed had entered into agreements with HSH and performed services at HSH and received referral payments from HSH. [Dkt. 1-2, Ex. C.]  As a basis for the termination of those physicians, Aetna's letters and notices cited Texas law, medical association ethics rules and its Physician Services Agreement which governs medical services provided by its in-network physicians to the ERISA plan members. [Dkt. 1-2, Ex. C.]

On November 22, 2013, HSH unsuccessfully challenged Aetna's use of the discovery produced in the Texas case as the basis for declining coverage and terminating Physician Services Agreements. [Dkt. 15-1 at 3]. The Texas court overruled the objection stating that Aetna could use the discovery to administer the plan.  Order on Relief, *Aetna v. Humble Surgical Hospital*, No. 4:12-cv-1206 (S.D. Tex. Nov. 26, 2013), ECF No. 177. The Texas court was not asked to and did not rule on the validity of Aetna's factual predicate for its benefit determinations.  Thereafter, on December 17, 2013, HSH filed this action in Connecticut state court and Aetna removed the case to this court and filed the subject motion.  HSH responded by filing a motion to remand, and contends, among other things, that it has not withheld information to which Aetna is entitled and that its participant agreements are proper.  [Dkt. No. 22].

In support of its defamation and business disparagement claims asserted in this case, HSH alleges Aetna is telling HSH's physicians, patients, and potential patients that HSH's Participation Agreements are illegal, improper and unethical, and that these communications by Aetna are false and misleading.  [Dkt. 1-2 at 4.]  In addition,  HSH complains that Aetna informed Aetna Insureds that it will not cover procedures performed at HSH after October 25, 2013, and is telling Aetna Insureds who have scheduled procedures at HSH to re-schedule their procedures at a different facility.  [Dkt. 1-2 at 4-5.]  At least 10 patients, all of whom are presumably Aetna insureds, have canceled procedures scheduled at HSH due to Aetna's communications.  [Dkt. 1-2 at 5.]  HSH further alleges that Aetna is contacting physicians who have Participation Agreements with HSH, telling those physicians that HSH has violated Texas law and has entered into "illegal, improper, and unethical agreements with physicians," and terminating its in-network agreements with those physicians.  [Dkt. 1-2 at 6.]

## II. HSH'S MOTION TO REMAND

HSH makes this motion pursuant to 28 U.S.C. § 1447(c) to remand this case back to the Connecticut Superior Court for the Judicial District of Hartford. [Dkt. No. 22].  HSH asserts that the case does not satisfy the requirements for either diversity jurisdiction or federal question jurisdiction, and therefore the court lacks subject matter jurisdiction over the case.  To support a removal action, the Court "must determine from the

record before us whether the [removing party] can establish a basis for either diversity or federal question jurisdiction." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994).  The removing party bears the burden of proving jurisdiction.  *See Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011) (citation omitted). Here, Aetna asserts that it removed the case on the grounds of both diversity jurisdiction and federal question jurisdiction based on preemption under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

## A.  Diversity Jurisdiction

Aetna's claim for removal based on diversity jurisdiction is without merit.  Aetna claims 28 U.S.C. § 1332, diversity of citizenship, in support of its removal.   Plaintiff rightly notes § 1441(b)(1)[2] bars Aetna's removal based on diversity of citizenship:

> (b) Removal based on diversity of citizenship.  ...  (2) A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b).   Aetna is incorporated and has its principle place of business in Connecticut.  As Aetna is clearly a citizen of Connecticut,

---

[2] Though Plaintiff cites to 28 U.S.C. § 1442(b)(2), that is apparently a scrivener's error, as the quote and citation clearly refer to 28 U.S.C. § 1441(b)(2).

removal from the state court to federal court based on diversity of
citizenship is not supported.

## B. Federal Question Jurisdiction

Aetna also asserts that federal question jurisdiction arises in this
case because HSH's state law claims of defamation and business
disparagement are preempted by ERISA. Analysis of a claim of ERISA
preemption must "start with the presumption that 'Congress does not
intend to supplant state law.'" *Stevenson v. Bank of N.Y.*, 609 F.3d 56, 59
(2d Cir. 2010) (quoting *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323 (2d Cir.
2003)).

The Supreme Court has set forth the inquiry for determining whether
a party's claim is completely preempted by ERISA § 502(a)(1)(B) (29 U.S.C.
§ 1132(a)(1)(B)).  "Claims are completely preempted by ERISA if they are
brought (i) by 'an individual [who] at some point in time, could have
brought his claim under ERISA § 502(a)(1)(B),' and (ii) under circumstances
in which 'there is no other independent legal duty that is implicated by a
defendant's actions.'" *Montefiore Med. Ctr.*, 642 F.3d at 328 (quoting *Aetna
Health Inc. v. Davila*, 542 U.S. 200, 210 (2004)).  Both prongs must be
satisfied. *Id.*  Additionally, prong one of the *Davila* inquiry requires
Defendant to make a two-part showing: (1) that the plaintiff "is the *type* of
party that can bring a claim pursuant to § 502(a)(1)(B)"; and (2) "whether
the *actual claim* that the plaintiff asserts can be construed as a colorable
claim for benefits pursuant to § 502(a)(1)(B)." *Montefiore*, 642 F.3d at 328

(citations omitted). In determining whether the removal is valid on the grounds of ERISA preemption, the court may "look beyond the mere allegations of the complaint to the claims themselves (including supporting documentation) in conducting its analysis." *Montefiore*, 642 F.3d at 331.

<u>1. ERISA Preemption Prong One – Step One</u>

Step one of prong one requires the court to determine whether HSH has standing to bring a claim under § 502(a)(1)(B).  Section 502(a)(1)(B) allows a "participant or beneficiary" to sue to "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Although the statute explicitly gives standing only to participants and beneficiaries, the Second Circuit has held that "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care" may bring a claim pursuant to § 502(a)(1)(B) and thus satisfy step one of prong one of the *Davila* inquiry. *Montefiore*, 642 F.3d at 329 (quotation and citation omitted).

HSH admits in their filings in this action that their patients have assigned HSH the right to bring claims under ERISA § 502(a)(1)(B), [Dkt. 22 at 3.], and also asserts in the Texas suit that HSH is "entitled to enforce the terms of the plans, as assignee of directly insured subscribers/members under."  [Dkt. 29, Ex. C, HSH Counterclaims at 7.]  However, HSH argues that it "does not attempt to bring its state law claims . . . in the capacity as the assignee of patient's claims," but rather brings the claims on its own

behalf. [Dkt. 22 at 3-4.]  Plaintiffs cite to precedent from the Eastern District
of Texas supporting their position. *See Encompass Office Solutions, Inc. v.
Ingenix, Inc.*, 775 F. Supp. 2d 938, 951-52 (E.D. Tex. 2011) (finding that
plaintiff's claim fails *Davila* prong one and ERISA preemption does not
apply because plaintiff's state law defamation and business disparagement
claims are "brought independently of the assignments and on [plaintiff's]
own behalf").

Plaintiff's argument is unpersuasive.  The *Davila* inquiry does not
ask whether HSH chose to bring their claims as an assignee, but rather
whether they "at some point in time, could have brought [their] claim under
ERISA § 502(a)(1)(B)."  542 U.S. at 210.  In *Vetanze v. NFL Player Insurance
Plan*, No. 11-cv-2734, 2011 U.S. Dist. LEXIS 148887 (D. Colo. Dec. 28, 2011),
the plaintiff raised the same argument raised by HSH, that step one of
prong one was not satisfied because plaintiff chose not to bring his claim
as an assignee.  The *Vetanze* court reasoned:

> Plaintiff's argument misses the point, which is whether he had
> standing to sue as an assignee. If choosing not to bring a claim
> under ERISA, notwithstanding his right to do so, ended the inquiry,
> then ERISA's complete preemption doctrine would be ineffectual.
> "[D]istinguishing between pre-empted and non-pre-empted claims
> based on the particular label affixed to them would elevate form over
> substance and allow parties to evade the pre-emptive scope of
> ERISA."

2011 U.S. Dist. LEXIS 148887, at *7 (quoting *Davila*, 542 U.S. at 214).  The
same reasoning has also been applied in this circuit. *See North Shore-Long
Island Jewish Health Care Sys. v. Multiplan, Inc.*, 953 F. Supp. 2d 419, 435
(E.D.N.Y. 2013) ("[E]ven if the Court were to accept plaintiff's

unsubstantiated argument that it does not bring these claims here as an assignee, it is well-accepted that this is insufficient for purposes of avoiding pre-emption.") (citations omitted).  Because Plaintiff has been assigned the right to bring a claim under ERISA § 502(a)(1)(B), Plaintiff has standing and thus could have brought a claim under § 502(a)(1)(B) and thus step one of prong one has been satisfied.

## 2.  ERISA Preemption Prong One – Part Two

Step two of prong one of the *Davila* inquiry asks whether either of the claims that HSH asserts can be construed as a "colorable" claim for benefits pursuant to § 502(a)(1)(B), which allows a plaintiff to "bring suit generically to 'enforce his rights' under the plan, or to clarify any of his rights to future benefits."  *Davila*, 542 U.S. at 210.  Aetna asserts that HSH's claims can be construed as colorable claims for benefits because resolution of HSH's claims depends on interpretation of the terms of an ERISA-governed employee benefit plan.  [Dkt. 34 at 13-17.]  HSH argues that it makes no claim for payment of healthcare services in its own capacity, and that its state law claims have no connection with any claim HSH could have brought for healthcare services.  [Dkt. 59 at 3.]  In order to determine whether either of HSH's claims is a "colorable" claim for benefits pursuant to § 502(a)(1)(B), the Court will consider the elements of each claim and the allegations in the complaint to determine whether they raise a colorable, albeit not express, claim to recover benefits due under the

terms of the Aetna administered plan, to enforce rights under the terms of the plan, or to clarify rights to future benefits under the terms of the plan.

To establish a prima facie claim for defamation under Connecticut law,[3] a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *See Hopkins v. O'Connor*, 925 A.2d 1030, 1042 (Conn. 2007); *Iosa v. Gentiva Health Services, Inc.,* 299 F. Supp. 2d 29, 37–38 (D. Conn. 2004). In order for a statement to be considered defamatory, it must be false; truth is an absolute defense to an allegation of defamation. *Devone v. Finley,* 3:13-CV-00377, 2014 U.S. Dist. LEXIS 36356, at *24 (D. Conn. Mar. 20, 2014).

In Connecticut, business disparagement is "akin to the torts of injurious falsehood and slander of title." *Doctor's Associates, Inc. v. QIP Holder LLC*, No. 3:06CV1710, 2010 U.S. Dist. LEXIS 14687, at *71 (D. Conn. Feb. 19, 2010) (quoting *Valtec Int'l, Inc. v. Allied Signal Aerospace Co.*, No. 3:93CV01171, 1997 U.S. Dist. LEXIS 7670, at *16 (D. Conn. Mar. 7, 1997)). The term "trade libel" has also been applied to cases involving the

---

[3] Aetna argues that the Court should conduct a choice of law analysis to determine which state's law governs Plaintiff's claims, and that the result of that analysis would lead the Court to find that Texas law governs. [Dkt. 34 at 13 n.9.] However, the Court will not conduct a choice of law analysis at this time, as Aetna concedes that Texas and Connecticut are substantially similar and this Court finds that it would be more appropriate for the Southern District of Texas to conduct a choice of law analysis after the Court has transferred the case. [Dkt. 34 at 14 n.10, 15 n.11.]

disparagement of the quality, utility or value of another's products or services.  1 D. Pope, Connecticut Actions and Remedies: Tort Law (1996) § 13:01, pp 13-2 – 13-3; *see, e.g.*, *QSP, Inc. v. Aetna Cas. and Sur. Co.,* 773 A.2d 906, 917 (Conn. 2001) ("Defamation or disparagement of a business' goods and services may be considered trade libel").  To prove these torts, and thus to prove commercial disparagement, the plaintiff must establish 1) the publication of a statement that casts doubt upon the quality, utility or value of the plaintiff's products or services; 2) the falsity of the statement; 3) that the statement was made with malice; and 4) that special damages were incurred as a result of the statement.  1 D. Pope at §§ 13:03–04, pp 13-6–13-7; *see, e.g., Rogers Corp. v. Arlon, Inc.,* 855 F. Supp. 560, 571 (D. Conn. 1994). Because business disparagement is a "species" of defamation, *QSP, Inc.,* 773 A.2d at 917 (citations omitted), the court will consider the claims together in determining whether HSH has presented a "colorable" claim for benefits under § 502(a)(1)(B).

The crux of the issue is whether the determination of the claims asserted by HSH would enforce rights under the plan, or would clarify any of the plan beneficiaries' rights to future benefits under the plan. HSH argues that its "claims for business disparagement and defamation have no connection with any claim it might have rendered for healthcare services."  [Dkt. 59 at 3.], HSH relies on *Encompass Office Solutions, Inc. v. Ingenix, Inc.,* supra.  That case is distinguishable because the plaintiff in that case did not seek the payment of benefits under an ERISA plan.

Instead, in addition to defamation claims arising from communications made by the defendant, the plaintiff sought damages for its detrimental reliance on the ERISA fiduciary's erroneous representation that a procedure was covered when in fact it was not covered by the plan at the rate represented, distinguishing *Encompass* from this case.  Unlike the present case, a judgment in favor of the plaintiff in *Encompass* would not necessarily call into question the plan fiduciary's decisions regarding the plan beneficiaries' rights to past or future benefits under the plan.

The Court agrees that resolution of the defamation claim will require construction of the terms of the benefits plans at issue and Aetna's performance of its fiduciary duties under the plan, the effect of which would be to clarify if not enforce rights under the plan to past and future benefits under the plan.  If the challenged statements allegedly made by Aetna and upon which it relied in denying coverage of healthcare services rendered by HSH to Aetna plan beneficiaries were not true, Aetna's denial of benefits would have been wrongful and the benefits denied as well as future benefits would be recoverable.  Likewise, if the statements were true but did not entitle Aetna to deny benefits under the terms of the plan, plan beneficiaries and their assignee HSH would be entitled to past and future benefits under the plan.  Consequently this suit is a colorable claim under ERISA for benefits under the plan cognizable in federal rather than state court.  *Cf. Curcio v. Hartford Fin. Servs. Grp.*, 469 F. Supp. 2d 18, 23 (D. Conn. 2007) (considering prong one of the *Davila* inquiry and finding that

"[a]lthough framed as damages recovery related to her breach of contract

and other related claims . . . , plaintiff's quantum meruit claim

unequivocally seeks severance benefits under . . . , a plan governed by

ERISA.").

The express language of the complaint further supports that this is a

claim for benefits or to establish rights under the plan, as many of the

allegations made to support the claims asserted by HSH in the Complaint

can easily be read to support a claim for benefits under § 502(a)(1)(B).  HSH

alleges that "Aetna consistently underpays claims, occasionally paying

nothing at all."  [Compl. ¶ 8.]  HSH also provides specific examples of

patients who have allegedly been wrongly denied coverage for procedures

performed at HSH:

> 27. One . . . patient who previously had surgery at HSH wished to
> have an additional surgery there.  Aetna contacted the patient and
> told the patient Aetna would not cover the procedure at HSH.
>
> 28.  Although that patient's plan allows for out-of-network coverage,
> Aetna is forcing the patient to have the procedure performed at an in-
> network facility. Further, the patient had met the out-of-network
> deductible already for the year.
>
> 29.  Aetna's misleading and false communications are alienating
> HSH's patients and causing patients to cancel procedures at HSH. To
> date, at least 10 patients have canceled procedures at FISH due to
> Aetna's intentional communications, with additional patients
> contacting HSH on a daily basis.

[Compl. ¶¶ 27-29.]   The gravamen of these assertions is that Aetna is

erroneously interpreting and administering the plan, improperly denying

coverage for medical services which HSH has and was scheduled to

provide.  If HSH prevails on its defamation and business disparagement

claims it would certainly be entitled to receive future benefits under the ERISA plan, notwithstanding the arrangements challenged by Aetna. Because HSH is challenging Aetna's interpretation and administration of the plan at issue, the effect of this suit almost necessarily affects future benefit eligibility determinations under the plan.  As a result, a judgment in favor of HSH in this case would necessarily enable HSH to enforce its rights to provide healthcare services to Aetna insureds and to receive benefits under the terms of the plan for such services.  At the very least a judgment rendered in this case would clarify its rights to future benefits under the terms of the plan.

For the above reasons, the court finds that HSH's defamation claims are "colorable" claims for benefits under § 502(a)(1)(B).

### 3. ERISA Preemption Prong Two

The second prong of the *Davila* inquiry asks the Court to consider whether any legal duty independent of ERISA is implicated by defendants' actions.  HSH argues that they are challenging only the content of communications made by Aetna, and that such challenge is completely independent of ERISA benefit determinations.  [Dkt. 22 at 4-7.]  Aetna argues that the state law defamation claims are not independent because resolution of the claims requires review of the plans and Aetna's administration of the plans.  [Dkt. 34 at 18-20.]

The Supreme Court found in *Davila* that plaintiffs' state law claims did not arise independently of ERISA or the plan terms because

**14**

"interpretation of the terms of respondents' benefit plans forms an essential part of their [state law] claim, and [state law] liability would exist here only because of petitioners' administration of ERISA-regulated benefit plans." 542 U.S. at 213. Under the state law claim raised in *Davila*, the defendant could not be liable if it denied coverage for any treatment not covered by the health care plan it was administering. 542 U.S. at 213. Thus, consideration of the state law claim required the court to determine whether treatment was covered under the health care plan administered by the defendant. Potential liability for the defendants "[derived] entirely from the particular rights and obligations established by the benefit plans." 542 U.S. at 213.

In its Notice of Removal, Aetna asserts that Humble challenges statements made in the discharge of Aetna's duty as the claims administrator for the ERISA plan. [Dkt. 1 at 3.] Aetna asserts that it has a fiduciary obligation to the plan members to ensure that healthcare services are provided according to the relevant plans, that physicians adhere to their in-network agreements with Aetna, and that healthcare claims are paid according to state law and at reasonable and reasonableness of fees and costs. [Dkt. 1 at 4.] Thus the claims asserted by HSH arise from the administration of and can only be determined by interpreting the plan and thus are not independent of the plan. The alleged defamatory statements were made in communications to ERISA plan members and in-network physicians. These communications asserted, among other things, that

HSH had entered into an "improper agreement" with in-network physicians. [*See, e.g.*, Dkt. 1-2, Ex. A at 1.]  In the termination letters sent to some in-network physicians, Aetna asserted that the referral agreements between those physicians and HSH violated Texas law, the ethical standards of the medical profession, and those physicians' agreements with Aetna. [Dkt. 1-2, Ex. C at 1.]  Determination of the validity of these statements requires interpretation of the plan.

Additionally, resolution of HSH's claims will require the Court to consider the terms and conditions of and Aetna's discharge of its fiduciary duties as administrator of the plans.  "Even though these claims are labeled by [HSH] as state law, the claims arose from the manner in which [Aetna] determined not to cover [claims submitted by HSH] and the subsequent notification to patients that [claims submitted by HSH] would not be covered under the [plan]."  *Mayeaux v. Louisiana Health Serv. and Indem. Co.*, 376 F.3d 420, 433 (5th Cir. 2004).  Further indication that resolution of HSH's claims requires interpretation of Aetna's plan administration comes from the Texas suit, in which the court authorized Aetna to use "information about the practices and providers" that it gained in discovery in the Texas suit "so long as its use is directly related to its participants, plans, providers, practices, physicians, and other aspects of claim administration."  Order on Relief, *Aetna v. Humble Surgical Hospital*, No. 4:12-cv-1206 (S.D. Tex. Nov. 26, 2013), ECF No. 177.

Additionally, the potential existence of a qualified privilege defense to the defamation claims reinforces the point that the defamation claims are not independent of ERISA.  *See, e.g.*, *Gambardella v. Apple Health Care, Inc.*, 969 A.2d 736, 742 (Conn. 2009) ("A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege.").   Determining whether a defendant is protected by a qualified privilege is a two-step inquiry: (1) does the privilege apply; and (2), has the privilege been defeated through abuse. *See Gambardella*, 969 A.2d at 742-43.  The first step of the inquiry, determining whether a privilege applies, will require a court to consider the terms of the benefit plans and/or Aetna's duties in administering those plans.  The court will have to determine whether the terms of the plans required or permitted Aetna to make these communications under the plan, and/or whether Aetna's duties as a plan administrator required or permitted it to make these communications. *Cf. Mayeaux v. La. Health Serv. Indem. Co.*, 376 F.3d 420, 432-33 (5th Cir. 2004) (holding that ERISA completely preempted provider's suit for defamation and intentional interference against plan administrator which arose from the manner in which the administrator determined not to cover a treatment "and the subsequent notification to patients" that the treatment would not be covered).

Although it was decided long before the *Davila* inquiry was promulgated, *Thomas v. Telemecanique*, 768 F. Supp. 503 (D. Md. 1991), is also persuasive.  While on disability leave from defendant employer,

plaintiff was seen working at a part-time job by an employee of defendant. That employee confronted plaintiff in public, and accused her of committing fraud by collecting disability payments from defendant while working part-time for another employer.  Those statements were then republished to others, including creditors of the plaintiff and her doctor. The district court found that the defamation claim was preempted by ERISA because "[t]he entire issue is whether or not [plaintiff] had a right to receive benefits, and whether her benefits were improperly terminated." 768 F. Supp. at 506.  Similarly, consideration of HSH's claims will require reference to the benefits plans and Aetna's administration of those plans.

Further, the confluence of the contractual, ethical and legal rationales for denying benefits and terminating physician agreements necessitates interpretation of the ERISA benefit plan to determine both liability and possibly causation, assuming both the contractual and either the ethical or the legal rationales for the benefits determinations and physician terminations were found to have been baseless.  Finally, interpretation of the plan might also be required to determine the proper allocation of damages as between the multiple causes found. *See, e.g.*, *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) (holding that "an ERISA fiduciary, who effectively has discretionary control over plan assets by virtue of an indemnification agreement, may be indemnified by the plan only for those expenses that are incurred pursuant

to his duties with the plan, and that are undertaken for the exclusive benefit of the plan.").

In sum, interpretation of the plan and scrutiny of Aetna's administration of the plan are necessary to establish the validity of one of the reasons given by Aetna for its actions; and, interpretation of the plan may be necessary to establish causation and damages.  The Court recognizes that this ruling may leave plaintiff without a remedy for some harms.  As Justice Ginsburg noted in her concurrence in *Davila*, ERISA preemption as it exists now creates a sort of "regulatory vacuum" in which "[v]irtually all state law remedies are preempted but very few federal substitutes are provided."  *Davila*, 542 U.S. at 222 (Ginsburg, J., concurring) (quotation and citation omitted).  However, because it is not possible to resolve either of HSH's claims without interpreting the benefit plans and Aetna's performance of its fiduciary duties under the plans, the Court finds that Plaintiff's claims do not arise independent of the plan.  Accordingly, prong two of the *Davila* inquiry is satisfied.

## 4.  HSH's General Argument Against Preemption

HSH also raises a general challenge to ERISA preemption in this case, arguing generally that "it is black letter law that ERISA cannot preempt state law claims where the gravamen of the complaint does not involve unpaid benefits or a plaintiff's rights under the plan(s) at issue." [Dkt. 22 at 7.]  HSH then cites to several cases in which preemption is rejected.

HSH's citations to *Grof-Tisza v. Housing Authority of the City of Bridgeport*, No. 3:11-cv-149, 2011 U.S. Dist. LEXIS 49938 (D. Conn. May 10, 2011) and *Stevenson v. The Bank of New York Company, Inc.*, 609 F.3d 56 (2d Cir. 2010), are distinguishable because in both cases the plaintiffs' claims arose from promises made by their employers regarding future benefits in an attempt to entice the plaintiff to do something. As the Second Circuit stated in *Stevenson*, the claims "make reference to ERISA plans solely as a means of describing the consideration underlying an alleged contract that itself is separate from the terms of any plan . . ." 609 F.3d at 62. Determining liability for the claims in those cases did not require the court to consider the terms of or administration of a benefit plan, as it does here.

The court finds HSH's citation to *Grand Park Surgical Center, Inc. v. Inland Steel Co.*, 930 F. Supp. 1214 (N.D. Ill. 1996) unpersuasive, because that court acknowledged that "a defamation claim could present a challenge to the plan's processing of benefits," but found that the plaintiff was not trying to do an "end-run" around ERISA preemption, 930 F. Supp. at 1219. In the instant case the heart of HSH's complaint is a challenge to Aetna's plan administration, and thus the defamation claims are an attempt to make an "end-run" around ERISA preemption. *Cf. Fairneny v. Savrogan Co.*, 664 N.E.2d 5, 10 (Mass. 1996) (finding that plaintiffs' defamation claims are preempted by ERISA because "[e]stablishing the defamatory nature of [a trustee's] communications, . . . would put in issue the reason for the

plaintiffs' confrontation with him" and "any trial of the defamation claim inevitably would involve testimony about the provisions of the plan, the precise nature of the plaintiffs' duties as fiduciaries, and [a trustee's] alleged breach of his fiduciary obligations."); *Jackson v. Kroch's & Brentano's, Inc.*, No. 93-C-1333, 1993 U.S. Dist. LEXIS 8965, at *19 (N.D. Ill. June 30, 1993) (finding plaintiff's defamation claim preempted by ERISA in part because "consideration of the defamation claim in this case will necessarily involve an examination of the ESOP and is, therefore, 'intertwined with the ERISA plan.'") (quoting *Thomas v. Telemecanique, Inc.*, 768 F. Supp. 503, 506 (D. Md. 1991)).

In a footnote, HSH cites to three other cases in which ERISA preemption was rejected.  [Dkt. 22 at 7-8 n.3 (citing *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 324 (2d Cir. 2003) (affirming district court's finding that plaintiffs' state law claims of promissory estoppel, breach of contract, and professional malpractice, alleging that defendant was negligent in allowing retirement benefits plan to become dangerously underfunded, were not preempted by ERISA); *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46-50 (2d Cir. 2002) (noting that it was undisputed that plaintiff's claims were preempted by ERISA but finding that plaintiff was not a participant in an ERISA plan, and therefore her claims could not be preempted by ERISA); *Collins v. S. New Eng. Tel. Co.*, 617 F. Supp. 2d 67, 84 (D. Conn. 2009) (finding that plaintiffs' state law claims for racial discrimination, intentional infliction of emotional distress, breach of

contract, and breach of implied duty of good faith and fair dealing are not preempted by ERISA)]. However, Plaintiff has not asserted or demonstrated that these cases are analogous to the instant case, and in its own review of these cases, the Court does not find them either analogous or persuasive.

Contrastly, the court finds more analogous and persuasive *Berry v. MVP Health Plan, Inc.*, NO. 1:06-cv-120, 2006 U.S. Dist. LEXIS 95923 (N.D.N.Y. Sept. 30, 2006), cited by defendants. In *Berry*, plaintiff medical provider brought claims against defendant insurance company under New York state insurance law, and claims for defamation and unjust enrichment. Defendant removed the action to federal court, claiming subject matter jurisdiction on the grounds of ERISA preemption. In addition to failing to pay invoices submitted by plaintiff for services performed for defendants' insureds, defendants sent letters to the medical community stating that plaintiffs were unreasonable in calculating their fees, and threatening adverse consequences to hospital staff members who allowed plaintiff to provide services to defendants' insureds. The *Berry* court concluded that "because plaintiffs' defamation claim requires inquiry into [defendants'] handling of plaintiffs' claims for benefits as assignees, it falls within the scope of ERISA's civil enforcement provisions and is preempted." 2006 U.S. Dist. LEXIS 95923, at *24-25. HSH's attempts to distinguish this case by arguing that the "only discussion" of defamation was a "[broad] quote" from *Mayeaux* is unpersuasive.

For the above reasons, the Court finds that the Court has subject-matter jurisdiction over this action because HSH's claims are preempted by ERISA, and thus Aetna has satisfied its burden of justifying removal. The motion to remand is thus denied.

The remaining question is whether, because HSH's claims are preempted, the Court should characterize HSH's claims as claims for benefits under § 502(a)(1)(B), or give Plaintiffs leave to replead the claims, if possible, as arising under the civil enforcement provision of ERISA. *See, e.g.*, *Berry*, 2006 U.S. Dist. LEXIS 95923, at *28 (granting plaintiffs leave to replead their claims as arising under the civil enforcement provision of ERISA because "plaintiffs do not assert that their state law claims are sufficient to state claims under § 502 of ERISA"); *see also Enigma Mgmt. Corp. v. Multiplan, Inc.*, 994 F. Supp. 2d 290, 305 (E.D.N.Y. 2014) (declining to recharacterize plaintiff's claims as ERISA claims and instead granting plaintiff the opportunity to replead its claims); *Biomed Pharms, Inc. v. Oxford Health Plans (NY), Inc.*, No. 10 Civ. 7427, 2010 U.S. Dist. LEXIS 141812, at *19-20 (S.D.N.Y. Feb. 17, 2010) (granting plaintiff leave to amend its pleadings to assert ERISA § 502 claims directly). The court grants plaintiff leave to file an amended complaint pleading claims under § 502(a)(1)(B) within 21 days after the case is transferred to the Southern District of Texas.

## III. AETNA'S MOTION TO TRANSFER

Having determined that subject matter jurisdiction exists, the Court will no consider Aetna's motion to transfer, or in the alternative, to dismiss. Defendant argues that the case should be transferred to the Southern District of Texas because the issues raised in this action are "wholly duplicative" of issues raised in the first-filed Texas suit, or alternatively, that this case should be transferred to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a).

## A. First-to-File Rule

"As a general rule, 'where there are two competing lawsuits, the first suit should have priority." *Emplrs. Ins. v. Fox Entm't Group, Inc.*, 522 F.3d 271, 274-75 (2d Cir. 2008) (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989)).  The first-filed rule is "only a presumption that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action." *Emplrs. Ins.*, 522 F.3d at 275 (quotation and citation omitted).  There are two exceptions to the first-filed rule recognized in the Second Circuit: "(1) where the 'balance of convenience' favors the second-filed action, . . . and (2) where 'special circumstances' warrant giving priority to the second suit, . . . ." *Emplrs. Ins.*, 522 F.3d at 275 (internal citations omitted).

The first-filed rule applies in situations where both suits are duplicative.  Claims are considered duplicative, for purposes of the first-to-file rule, if they arise from same nucleus of facts. *See, e.g.*, *Tucker v. Am. Int'l Grp., Inc.*, 728 F. Supp. 2d 114, 121 (D. Conn. 2010) (citation omitted).

The claims in the instant case arise from the same nucleus of facts as those brought in the Texas suit.  Both suits involve the exact same parties and overlapping issues.  For HSH to prove the defamation or business disparagement alleged in the instant action, HSH would have to prove that its conduct did not violate the ERISA plans and the physician agreements between Aetna and its physicians.

HSH argues that the Texas suit is merely the "backstory" to the instant action, and that the two cases contain wholly separate claims and issues.  [Dkt. 40 at 4-7.]  Though HSH attempts to portray the suits as exclusive of the Texas suit, they overlap.  Aetna's statements, which HSH claim are defamatory, stem from the facts surrounding the Texas litigation. The overlap of facts and issues can be seen from Aetna's complaint and the Texas court's record.  At the time of the original complaint, the physicians' Participation Agreements had not been disclosed; yet, the means of referring Aetna's insured from in-network facilities to HSH's out-of-network center are still featured as an important aspect of the alleged overcharging scheme:

> HSH LLC, through its owner-physicians, is financially abusing Aetna members via referrals to the Center's out-of-network facilities in which the referring physicians have a financial ownership. The Center in turn charges outrageous fees for outpatient services.

Compl. ¶ 8, *Aetna Life Ins. v. Humble Surgical Center, LLC*, 4:12-cv-01206 (S.D. Tex. April 18, 2012), ECF No. 1.

With regard to the relevancy of HSH's Participation Agreements to Aetna's claim of over-billing, the Texas court stated in a hearing on

October 24, "the participation agreements are directly related." [Dkt. No. 36 at 4]. This Court agrees, and the Court finds that the presumption of the first-filed rule applies here, and will next consider whether this case falls under either of the exceptions to the rule.

## 1. Balance of Conveniences

In applying the "balance of convenience" exception, the Second Circuit considers "the ties between the litigation and the forum of the first-filed action." *Emplrs. Ins.*, 522 F.3d at 275. As the Second Circuit has explained:

> The factors relevant to the balance of convenience analysis are essentially the same as those considered in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a). . . . Among these factors are: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*Emplrs. Ins.*, 522 F.3d at 275 (quotations and citations omitted).

## (a) Plaintiff's Choice of Forum

In regards to the plaintiff's choice of forum, Aetna argues that the HSH's choice of forum in this case should be given very little weight because HSH's home forum is the Southern District of Texas and the operative facts of the underlying dispute occurred in that district. [Dkt. 15 at 9.] Aetna argues that the only connection to the District of Connecticut is the fact that Aetna is incorporated in Connecticut.

26

HSH does not identify any relevant facts or witnesses in Connecticut, but argues that because Aetna's primary place of business is Connecticut, "surely some of this information is located in Connecticut."  [Dkt. 40 at 9.] Aetna asserts that the acts complained of occurred in Texas, Aetna's communications to members and in-network physicians took place in the Southern District of Texas, and that Aetna's witnesses are mostly in Texas, with one possible witness in Pennsylvania.  [Dkt. 15 at 10; Dkt. 68 at 8-9.] Aetna further asserts that all of the non-party witnesses, including Aetna's members and the doctors, are in Texas. [Dkt. 15 at 10; Dkt. 68 at 8-9.]

"[A] plaintiff's choice of forum is given less weight where the case's operative facts have little connection with the chosen forum." *TM Claims Serv. v. KLM Royal Dutch Airlines*, 143 F. Supp. 2d 402, 404 (S.D.N.Y. 2001) (quoting *1-800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 134 (S.D.N.Y. 1994)).  Here, it appears from the filings in this case that the only identifiable connection to Connecticut is the fact that Defendant is located in Connecticut, and the possibility that some witnesses and evidence may be in Connecticut.  The Court finds that this connection to Connecticut is insufficient to give controlling weight to HSH's choice of forum.  *Cf. Charter Oak Fire Ins. Co. v. Broan-Nutone, LLC*, 294 F. Supp. 2d 218, 220 (D. Conn. 2003) (finding that plaintiff's choice of forum was not controlling where only connection to the cause of action was that the plaintiff resides there); *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 258, 267 (D. Conn. 2012) (giving little deference to plaintiffs' choice of

forum where plaintiffs do not live in the forum and their claims lack any connection to the forum); *Mitsui Marine & Fire Ins. Co. v. Nankai Travel Int'l Co., Inc.*, 245 F. Supp. 2d 523, 525 (S.D.N.Y. 2003) (finding plaintiff's choice not controlling where the locus of operative facts was Chicago and Los Angeles and the only connection to the forum was the fact that plaintiff had an office and place of business in the forum). Similarly, this case is distinguishable from the case cited by Plaintiff, *Panterra Engineered Plastics v. Transportation Systems Solutions, LLC*, because a great many of the relevant facts in that case occurred in Connecticut. 455 F. Supp. 2d 104, 107-08 (D. Conn. 2006). Nor is Plaintiff's citation to *Tucker v. American International Group* persuasive, because, as Defendant points out, the *Tucker* court declined to transfer the case because the first-filed case was no longer pending, the parties to the two cases were not the same, and the issues in the two cases did not arise from the same nucleus of facts. 728 F. Supp. 2d 114, 121, 122-23, 124 (D. Conn. 2010).

The Court agrees that HSH's choice of forum should be given very little weight in this case, given the very weak connections to Connecticut and the strong connections to the Southern District of Texas.

(b) Locus of the Operative Facts and Location of Relevant Documents and Relative Ease of Access to Sources of Proof

"The location of operative facts underlying a claim is a key factor in determining a motion to transfer venue." *Charter Oak Fire Ins. Co.*, 294 F. Supp. 2d at 220. "To determine the 'locus of operative facts,' a court must

look to the 'site of the events from which the claim arises." *Charter Oak Fire Ins. Co.*, 294 F. Supp. 2d at 220 (quotation and citation omitted).  As described above, Part III.A.1.a, the only identifiable connection to Connecticut in this case is the location of the Defendant, and Plaintiff's assertion that some of the relevant facts and/or witnesses must be located in Connecticut.  It is clear from the record before the Court that although there may be some evidence in Connecticut, the locus of operative facts in this case is Texas.  Further, as Judge Hughes stated in a January 7, 2014 hearing in the Texas suit: "The witnesses are here, the injury was here, the patients are here, two sets of lawyers familiar with the case, the ones who dealt with Aetna so they had the information to know to quit using them as a provider. All that stuff, those decisions, those actions, all festered and then blossomed here. Right or wrong, it's a Houston problem."  [Dkt. 41, Ex. A., 01/07/2014 Hearing Tr. at 5:23-6:4, *Aetna v. Humble Surgical Hospital*, No. 4:12-cv-1206 (S.D. Tex.).]  Thus, this factor weighs in favor of transfer.

<u>(c) Convenience of the Witnesses</u>

As noted above, Part III.A.1.a, Aetna asserts that the majority of the witnesses are in Texas, including one of their key witnesses.  However, Aetna has not specified the key witnesses to be called, aside from naming one witness, and thus the Court cannot evaluate this factor.  *Cf. Charter Oak Fire Ins. Co.*, 294 F. Supp. 2d at 220 ("A party moving under Section 1404(a) must specify the key witnesses to be called and make a general

statement of what their testimony will cover.") (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978)).

(d) Convenience of the Parties

This factor is not significant in this case, but weighs slightly in favor of transfer, as the party that would be inconvenienced by the transfer, Aetna, is the party seeking the transfer.  Transfer to the Southern District of Texas would be convenient for HSH, and thus the Court finds that this factor weighs slightly in favor of transfer.

(e) Availability of process to compel the attendance of unwilling witnesses

Neither party addressed this factor and thus the Court cannot determine whether it weighs in favor of transfer. However, as the locus of operative facts is Texas, this factor appears to militate in favor of transfer to Texas.

(f) Relative means of the parties

Neither party addressed this factor but it is clear from the litigation in this court that both parties are sophisticated commercial entities and apparently able to litigate in any forum.  Because the party seeking the transfer is the party that would potentially bear the greater cost imposed by a transfer, this factor weighs slightly in favor of transfer.

Further, there is no reason to believe that the Southern District of Texas will not do an excellent job of applying Connecticut law in resolving Plaintiff's Connecticut state law claims.  Given that resolution of Plaintiff's claims will require, among other things, the application of Texas law to

determine the truth of the challenged communications, this consideration weighs in favor of transfer.

Finally, it would serve the interest of judicial efficiency to transfer this case to the Southern District of Texas, as the resolution of the claims in this case will require the Court to consider the facts and circumstances surrounding the content of the challenged communications, an issue that is already being litigated in the Texas suit.  The common parties and issues, and the familiarity of that court with the parties and communications at issue will allow that Court to potentially resolve this action more efficiently, which weighs in favor of transfer.

## 2. Special Circumstances

In the Second Circuit, the "special circumstances" in which a court may dismiss the first-filed case "are quite rare."  *Emplrs. Ins.*, 522 F.3d at 275.  One "special circumstance" would be where "the first-filed lawsuit is an improper anticipatory declaratory judgment action."  *Emplrs. Ins.*, 522 F.3d at 275.  Another example of "special circumstances" is "when the first-filed suit is against the customer of an alleged patent infringer, while the second suit involves the infringer directly."  *Emplrs. Ins.*, 522 F.3d at 275.  Another example is evidence of "deceptive or manipulative behavior by the first-filed plaintiffs" in their choice of venue.  *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112-13 (2d Cir. 2010).  Plaintiff does not argue that a "special circumstance" exists in this case,

31

nor does the Court discern from its own review of the record any such special circumstance.  Thus, this exception does not apply here.

After considering all of the above factors, the Court finds that Aetna has demonstrated by clear and convincing evidence that this case should be transferred to the Southern District of Texas.

### B. § 1404(a) Transfer Analysis

As the court has determined the case should be transferred pursuant to the first-to-file rule, the Court need not consider Aetna's argument for transfer pursuant to § 1404(a).

### IV. AETNA'S MOTION TO DISMISS

Aetna argues in their motion to transfer that the case should either be transferred or dismissed.  [Dkt. 15 at 2, 5, 7, 11.]  Because the Court grants the motion to transfer, the Court denies Aetna's motion to dismiss.

### CONCLUSION

For the reasons listed above, HSH's motion for remand is denied, Aetna's motion to transfer to the Southern District of Texas is granted, and Aetna's motion to dismiss is denied without prejudice to re-filing after the case has been transferred to the Southern District of Texas.  The court grants plaintiff leave to file an amended complaint pleading claims under § 502(a)(1)(B) within 21 days after the case is transferred to the Southern District of Texas.

SO ORDERED

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 30, 2014**